## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

FARIDA BROWN,                          §
                                       §
    Plaintifs                       §
                                       §
VS.                                    §          CIVIL ACTION NO: 5:19-cv-184
                                       §
THE UNITED STATES OF AMERICA           §
                                       §
    Defendant                       §

## PLAINTIFF'S ORIGINAL COMPLAINT

COME NOW FARIDA BROWN, Plaintiff, and brings this Original Complaint against Defendant, THE UNITED STATES OF AMERICA, under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674 for the United States Air Force's actions and inactions which led directly to a former Airman, Devil Patrick Kelly, shooting Ms. Brown and others while she worshipped at the First Baptist Church of Sutherland Springs, Texas  Plaintiff would show the Court as follows:

### I.      SUMMARY OF CLAIMS AND CAUSES OF ACTION

1.      Plaintiff Farida Brown was shot through the legs and hit by shrapnel on November 5, 2017 when former Airman Devin Kelly opened fire on the First Baptist Church in Sutherland Springs, Texas.  Farida Brown brings causes of action against the United States for (1) Negligence for the danger created by the Air Force, (2) Negligent Undertaking, and (3) Negligent Training and Supervision; all causes of action under Texas law, the law of the place where the events occurred.

2.      Plaintiff presented her causes of action to the United States more than six months prior to suit and sought permission to join prior to the end of the six-month period, but the United States did not respond, forcing her to wait the full six months.  *See* 28 U.S.C. § 2675 (a).

3.      Plaintiff presents viable causes of action for which relief may be granted and for

1

which there is subject matter jurisdiction irrespective of the United States' motion to dismiss in the *Holcombe* case.[1]

4.      In summary, the Air Force trained a psychotic man how to kill in mass, knew he was homicidal, and then unleashed him on the public without complying with Department of Defense ("DOD") requirements to report him to both a DOD database and to the FBI.  The Air Force has confessed to negligence in a 131-page DOD report,[2] in which the Air Force admits to the horrid facts of Kelley's mental disorders, violence, and threats of mass murder, and the Air Force blames a "systemic problem" of lack of training and supervision for the failure to report Kelley to the FBI and to a DOD database.  These failures led to the worst mass shooting in Texas history, when Kelley opened fire on a church, killing 26 persons and wounding 22 more, including Plaintiff.  The Brady Bill was intended to prevent such massacres, and the Air Force has a decades-long problem of non-compliance with reporting requirements, which were known to the Air Force long before Airman Kelly's mass shooting[3].  Plaintiff brings independent causes of action under Texas law, which the FTCA makes actionable against the United States.  Applying the Brady Bill's immunity provision outside its literal scope – which the United States seeks to do – would defeat

---

[1] Plaintiff agrees with the briefing of the other Plaintiffs in the *Holcombe* v. US, 5:18-cv-555-XR case, and believes that the United States' motion to dismiss in *Holcombe* should fail, and herein asserts that her causes of action, as pled, present viable claims that would not be defeated by the United States' current motion to dismiss.

[2] Exhibit A.  Report No. DODIG-2019-030, Inspector General U.S. Department of Defense, Dec. 6, 2018, *Report of Investigation into the United States Air Force's Failure to Submit Devin Kelley's Criminal History Information to the Federal Bureau of Investigation; see id.* at p. 117, "The USAF concurred with this report and its recommendations." https://www.dodig.mil/reports.html/Article/1707300/report-of-investigation-into-the-united-states-air-forces-failure-to-submit-dev/

[3] Exhibit B.  Report No. DODIG-2018-035, Inspector General U.S. Department of Defense, Dec. 4, 2017, *Evaluation of Fingerprint Card and Final Disposition Report Submissions by Military Service Law Enforcement Organizations. https://www.dodig.mil/reports.html/Search/DODIG-2018-035/*

the very purpose of both the Brady Bill and the Federal Tort Claims Act – and would create a glaring case of right without a remedy. Accountability is needed for both justice and public safety.

## Table of Contents

I.    SUMMARY OF CLAIMS AND CAUSES OF ACTION .................................................. 1

II.   JURISDICTION, VENUE & SERVICE OF SUMMONS .................................................. 3

III.  PARTIES ................................................................................................................ 5

IV.   STATUTORY BASIS OF LIABILITY AGAINST THE UNITED STATES OF AMERICA ............................................................................................................... 5

V.    FACTS ................................................................................................................... 6

    A.  Farida Brown is a grandmother who had an active lifestyle and was deeply involved in church ................................................................................................................ 6

    B.  The Air Force Knew Airman Devin Kelley' History of Extreme Domestic Abuse, Gun Threats, Mass Murder Threats, Escape from a Psychiatric Hospital, and Conviction .............. 7

    C.  The Air Force was required to - and undertook to - report persons such as Airman Kelley to an FBI database to prevent him from buying guns ............................................. 13

    D.  The DOD and Air Force admit to negligence and blame systemic failures in reporting, training, and supervision ................................................................................... 20

    E.  Farida Brown was shot multiple times in the legs during the Massacre of November 5, 2017 ............................................................................................................... 24

VI.   The FTCA Provides for Government Liability .................................................. 26

VII.  CAUSES OF ACTION: Negligence, Negligent Undertakings, Negligent Training and Supervision ......................................................................................................... 33

    A.  Negligence in the Danger the Air Force Created .............................................. 34

    B.  Negligent Undertaking in Failing to Report Kelley both to the FBI and to DIBRS .......... 38

    C.  Negligent Training and Negligent Supervision ................................................. 41

    D.  Brady Bill Immunity Does Not Apply ............................................................. 42

VIII. DAMAGES ........................................................................................................... 45

IX.   CONCLUSION ..................................................................................................... 45

## II.    JURISDICTION, VENUE & SERVICE OF SUMMONS

5.    This action is brought pursuant to the *Federal Tort Claims Act (FTCA), 28 U.S.C.§ 1346(b)(1) and 28 U.S.C. § 2671, et seq.*, against the United States of America, Department of the Air Force, which vests exclusive subject matter jurisdiction of Federal Tort

Claims litigation in the Federal District Court.  The claims herein are brought against Defendant for money damages as compensation for personal injuries caused by Defendant's negligence.

6.      Venue is proper in the Western District of Texas, pursuant to **28 U.S.C. § 1402(b)** because the United States is a Defendant, and a substantial part of the events and omissions giving rise to this claim occurred in the Western District of Texas.

7.      Service of summons may be had on the Defendant Pursuant to **Rule 4(i) of the Federal Rules of Civil Procedure** and 32 CFR § 257.5(d) (governing service on the Department of the Air Force) by delivery of a copy of the summons and complaint by certified mail return receipt requested to:

> John F. Bash, Esq.
> United States Attorney for Western District of Texas
> United States Attorney's Office
> ATTENTION: Civil Process Clerk
> 601 NW Loop 410, Suite 600
> San Antonio, TX 78216
>
>         and
>
> Attorney General of the United States
> The Attorney General's Office
> ATTENTION: Civil Process Clerk
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

8.      Pursuant to **28 U.S.C. §2675**, this claim was presented by the filing of an Administrative Claim with demand for monetary damages, on behalf of Plaintiff, with the appropriate agency of Defendant, the United States of America, namely the Chief of the Claims and Tort Litigation Division of the United States Air Force, the Secretary of the Air Force, the Department of Defense with attention to Legal, and the Office of the General Counsel for the U.S. Office of Personnel Management, which was received by such persons and agencies on August 22, 2018 by Fed Ex delivery.  Six months have passed, and the United States and Air Force have not

4

responded.  Therefore, all conditions precedent to a Federal Tort Claims Act action have been met.

### III.    PARTIES

9.      Plaintiff Farida Brown was a resident of La Vernia, Texas which is near Sutherland Springs.  She was a longtime member of the First Baptist Church of Sutherland Springs, and she was severely injured during the massacre of November 6, 2017.  Ms. Brown and her family have received death threats from false-flag conspiracy theorists, and thus cannot reveal her current address in a public filing.  She may be contacted through undersigned counsel.

10.      At all relevant times, the Defendant UNITED STATES OF AMERICA, acted through its agency DEPARTMENT OF THE AIR FORCE.

### IV.    STATUTORY BASIS OF LIABILITY AGAINST THE UNITED STATES OF AMERICA

11.      This case is brought against the United States of America pursuant to *28 U.S.C. §2671 et seq.,* commonly referred to as the "Federal Tort Claims Act" or FTCA.  Liability of the United States is predicated specifically on *28 U.S.C. §§1346(b)(1) and 2674* because the personal injuries and resulting damages that form the basis of this Complaint, were proximately caused by the negligence, wrongful acts and/or omissions of employees of the United States of America through its agency, DEPARTMENT OF THE AIR FORCE.  These employees were acting within the course and scope of their office or employment, under circumstances where the UNITED STATES OF AMERICA, if it were a private person, would be liable to the Plaintiff in the same manner and to the same extent as a private individual under the laws of the State of Texas.  Federal Tort Claims Act claims may be brought against the UNITED STATES OF AMERICA through the DEPARTMENT OF THE AIR FORCE for injuries of civilians due to the actions of soldiers, under facts such as these where the Air Forces' negligence, negligent undertaking, and negligent training and supervision caused injury at the hands of its service member.

## V.    FACTS

### A.  Farida Brown is a grandmother who had an active lifestyle and was deeply involved in church

12.    Farida Brown lived in La Vernia, Texas - near Sutherland Springs - for more than 20 years with her husband Charles Brown.  Farida and Charles Brown raised four children together, and Ms. Brown is currently the grandmother of nine grandchildren and one baby great-granddaughter.  Going to church was a big part of Farida and Charles' life, and Charles was the son of a preacher.  During their time in La Vernia, Farida and Charles found a church-home at the First Baptist Church in Sutherland Springs, Texas.  Prior to the shooting, Farida Brown had been a part of the church for around 20 years.  Her best friends went to church there, and she lost most of them in the massacre.

13.    Farida's husband Charles Brown passed away in late December 2011.  Afterwards, she lived with her son and his family in the Houston area and spent time with her daughter who lived south of Houston.

14.    Farida led an active life-style with her children and grandchildren.  She worked in the garden a lot.  She went calypso or reggae dancing with her daughter.  She played tennis, swam, fished, and worked out at a gym.

15.    Then Hurricane Harvey hit southeast Texas in August of 2017, and the Houston area went underwater.  Farida and her family were rescued by boat.  With the Houston area devastated, Farida moved back to La Vernia to be with her long-time friends and community at the First Baptist Church in Sutherland Springs, Texas.

16.    Farida was still very involved at the church.  She went to church at least four times a week, including for Tuesday women's bible study, Sunday morning service, Sunday night, and on other days to serve people, helping to clean and to cook.  Overall, Farida is a friendly and loving

person, and she was deeply involved with her church-family.

**B. The Air Force Knew Airman Devin Kelley' History of Extreme Domestic Abuse, Gun Threats, Mass Murder Threats, Escape from a Psychiatric Hospital, and Conviction**

17.     Airman Devin Patrick Kelley was a violently abusive person and severely mentally disturbed.  Having committed the worst mass shooting in Texas history, Kelley's history of violence has been thoroughly reported in the news and admitted by the Air Force.

18.     Kelley joined the Air Force after graduating New Braunfels High School in 2009. Kelley's public-school records showed he had been suspended at least seven times, and a classmate said he complained about medicine he was taking.  Nevertheless, Kelley was accepted into the Air Force, who trained him to shoot and kill.  Kelley received training from the Air Force to use the exact kind of weapon he used in the church-massacre, including a 5.56 assault rifle.  Beginning in 2010, Kelley served in logistics readiness as Holloman Air Force Base in New Mexico.  Kelley also married Tessa Kelley in April, 2011, but he began abusing his wife and infant stepson just months into their marriage.

19.     From at least 2011-2012, Kelley's violent and psychotic tendencies were known to the Air Force.  Kelley was court martialed for abusing his wife and stepson.  Kelley repeatedly struck, kicked and choked his wife.  Although his stepson was only a toddler, Kelley hit the young boy's head severely enough to facture his skull and shook him severely enough to cause internal bleeding.  Kelley confessed to using "a force likely to produce death or grievous bodily harm" when hitting the small boy.  According to the Air Force, Kelley pled guilty to doing it intentionally.

20.     The DOD's Report from December 2018 details much of this abuse.[4]  For example, from June 2-9, 2011, the 11-month old boy had to be taken to a hospital several times due to child abuse.  On June 9, 2011, Air Force Office of Special Investigations (AFOSI) Detachment 225

---

[4] *See* DODIG-20019-030 at p. 11-16.

opened an investigation for assault on a child, listing Kelley as a subject and collecting his fingerprints.  By June 24, 2011, the infant-boy had been placed in foster-care, and Tessa Kelley reported a physical assault to the Air Force after Kelley choked her and threw her against a wall.

21.     On September 7, 2011, Kelley voluntarily went to the HAFB Mental Health Clinic and "stated he was unable to cope with the stress he was under at work."  Kelly's work was for the Air Force as he was an active-duty serviceman.  "Kelley also stated that his supervisor was constantly 'yelling at work.'"  Kelley began to receive weekly treatment for psychological problems from the Air Force.

22.     Kelley's abusive conduct and psychological problems continued to worsen while on active duty with the Air Force.  Tessa Kelley reported additional physical abuse on February 17, 2012, and the 49th Security Forces Squadron investigators began an investigation.  Kelley requested legal counsel and refused to make a statement.  Kelley's Commander issued a "no contact order".  On February 22, 2012, Kelley again reported to the HAFB Mental Health Clinic and stated he did not believe he could help himself.  On February 23, 2012, Kelley entered in-patient care at the Peak Behavioral Health Services (PBHS), where he stayed through March 8, 2012 and was diagnosed with various mental and emotional disorders.  Peak Behavioral Health Services is located in Santa Teresa, NM, and has a program for military personnel.  From March to April 2012, Tessa Kelley reported Kelley threatening her with a gun at various times.  By April 27, 2012, Kelley made a "confession recording" for injuring his stepson, which was later passed on to his chain-of-command in the Air Force.  By April 30, 2012, Kelley again was confined to PBHS, and his wife reported he was going to kill his sergeant.  In fact, "Kelley stated that he was going to shoot himself and PBHS staff put a high-risk notification alert on his chart due to his

homicidal and suicidal indicators." [5]

23.    While Kelley was committed the second time, Air Force Office of Special Investigations ("AFOSI") agents interviewed Tessa Kelley and learned that Kelley was making mass murder threats.  Airman Kelly told his wife, "If the cops show up at my door, I will shoot them." and "My work is so lucky I do not have a shotgun because I would go in there and shoot everyone."

24.    On June 6, 2012, Kelley was caught attempting to buy guns on the internet to be sent to the psychiatric hospital, and a nurse reported that "his insight and judgment are so impaired that he does not make the connection about how that does not look good on him." [6]

25.    The next day, Airman Kelley escaped from the psychiatric hospital and fled 12 miles away to El Paso, TX, where local police caught him at a bus station.  According to a police report, police were informed that Kelley "was a danger to himself and others as he had already been caught sneaking firearms onto Holloman Air Force Base".  Police were further advised that Airman Kelley "suffered from mental disorders" and that he "was attempting to carry out death threats" against "his military chain of command."  Xavier Alvarez, who worked for Peak Behavioral and who reported Kelley to police for the escape, later confirmed to NBC News that Kelley "verbalized that he wanted to get some kind of retribution to his chain of command."  Other patients reported that Kelley was doing something suspicious on computers, and the military found that Kelley was "ordering weapons and tactical gear and magazines to a P.O. Box in San Antonio."  Alvarez was quoted as saying, "This kid – he was hollow," and "I could never reach him."  Moreover, Airman Kelley's Air Force Commander prepared a confinement package stating that

---

[5] *See* DODIG-20019-030 at p. 16.

[6] *See* DODIG-20019-030 at p. 17.

he was "convinced" that Airman Kelley was "dangerous and likely to harm someone if released" noting he was searching for firearms and body armor online.

26.     Months after Airman Kelley's escape from the psychiatric hospital, he pled guilty in a military court to repeated assaults on his wife and stepson, and he was sentenced to a year in confinement.  Airman Kelley was convicted of two charges of assault by a General Court-Martial, which is the highest court in the military justice system, such that his conviction is considered a felony.  As part of a plea deal, prosecutors withdrew several other charges, including allegations that he repeatedly pointed a loaded gun at his wife.  Nevertheless, the Air Force was clearly on notice of the danger from Airman Kelley having a gun or being released.  Airman Kelley was sentenced in November of 2012 to 12 months' confinement and reduced to the lowest possible rank, with his final duty title listed as "prisoner."  His wife divorced him while he was in military prison.

27.     After his conviction, Airman Kelley received a bad conduct discharge, but he was not finally discharged from the Air Force until May 2014.  The time between his release from confinement and final discharge was not peaceful.  Airman Kelley was investigated twice for abusing women.  Airman Kelley was the subject of an investigation for sexual assault and rape in 2013, but the investigation ended without the filing of any charges.  Deputies also responded to a report that Airman Kelley was abusing his then girlfriend Danielle Shields, but no arrest was made. At the time of both episodes, Kelley was still a member of the Air Force awaiting final discharge for bad conduct.  Airman Kelley married Ms. Shields two months after the report of abuse. Civilian law enforcement investigators were unaware of Airman Kelley's extensive criminal history due to the Air Force's failure to submit reports to the FBI or to otherwise warn the public. Had Airman Kelly's long history of violent, psychotic crime against women and children, as well

as his history of escaping mental institutions and threatening mass murder been known to civilian law enforcement, Airman Kelly would not have been treated as a first-time offender by the civilian authorities and he very likely would have been confined to prison at the time of the Sutherland Springs massacre.

28.     Airman Kelley was also charged with animal cruelty for beating a puppy in a trailer park, with a witness stating Airman Kelley began "beating on the dog with both fists, punching it in the head and chest" and "yelling at the dog while he was striking it [as] the dog was yelping and whining." Airman Kelley "then picked up the dog by the neck into the air and threw it onto the ground and then drug him away". This psychotic, violent behavior was consistent with his prior psychotic, violent behavior while in the Air Force.

29.     Air Force personnel should have reported Airman Kelley's conviction of court martial to the FBI for inclusion in a database to prevent him from buying guns. The FBI's National Instant Criminal Background Check System (NICS) makes convictions available from the National Criminal Information Check (NCIC) database. However, despite Kelley's history of extreme violence, gun threats, and mental disturbance, Air Force personnel failed to report him. In a press release of November 6, 2017, the Air Force admitted that "Kelley's domestic violence offense was not entered into the National Criminal Information Center database by the Holloman Air Force Base Office of Special Investigation." Accordingly, Kelley was able to pass background checks. After his release from confinement, Kelley passed background checks for jobs, including a background check to be a licensed security guard. Kelley later attempted to buy firearms, and finding he was able to clear background checks, he purchased various guns and shot them frequently. Specifically, in 2016, Kelley bought a Ruger 5.56 mm assault rifle from Academy Sports + Outdoors in San Antonio after clearing a background check of the NICS. Kelley also

posted a picture of his AR 5.56 on Facebook with a picture captioned, "She's a bad bitch".  The Ruger AR 5.56 is the gun he used when massacring the congregation of the First Baptist Church of Sutherland Springs, Texas on November 5, 2017 and is the civilian version of the weapon he was trained to use in the Air Force

30.     On September 30, 2016, Kelley sent a threatening Facebook message to his former supervisor in the Air Force, stating "Hey you stupid b****. You should have been put in the ground a long time ago.  Better hope I don't ever see you….," which was screenshot and forwarded to a supervisor.  However, the Air Force took no action.

31.     By 2017, Kelley had returned to a house in New Braunfels that was owned by his parents, located about an hour from the First Baptist Church of Sutherland Springs, Texas. Kelley's second wife, Danielle Shields, attended the church.  Farida Brown had known Danielle since Danielle was a little girl, but Farida had not seen her much since Danielle got married.  On Tuesday, October 31, 2017, the church held a Fall Festival, where Farida was cooking and serving around 300 people, including Airman Kelley himself.

32.     Unbeknownst to Farida Brown, Kelley had been abusing Danielle, and Danielle was seeking advice from the pastor of the church.  In abusive relationships the presence of a firearm increases the likelihood of homicide.[7]

33.     The very next Sunday, November 5, 2017, Kelley entered the church with an assault rifle, said that no one would get out alive, and then murdered 26 people and wounded around 20 more, including Farida Brown.

---

[7] *See* Campbell et al., *Assessing Risk Factors for Intimate Partner Homicide*, DOJ, Nat. Institute of Justice J., No. 250, p. 16 (Nov. 2003).

**C.  The Air Force was required to - and undertook to - report persons such as Airman Kelley to an FBI database to prevent him from buying guns**

34.     The dangers of a mentally disturbed violent domestic abuser having guns – both to family members and to others – are well known.  Mass shootings are often linked to domestic violence and regularly involve more victims than just the abused relative.  The 1968 Gun Control Act and subsequent amendments codified at 18 U.S.C. § 921 *et seq*. prohibit anyone convicted of a felony from possessing a firearm.  In 1996, this gun ban was extended to anyone convicted of crime of domestic violence, even for misdemeanors.  18 U.S.C. § 922(g)(9).  Military personnel are not exempt.  18 U.S.C. § 925(a)(1).  The Lautenberg Amendment - 18 USC §922(g)(9) -  was passed with almost unanimous support and represents Congress' recognition that "anyone who attempts or threatens violence against a loved one has demonstrated that he or she poses an unacceptable risk, and should be prohibited from possessing firearms."  Congressional Record, p. S11878, September 30, 1996.  Moreover, it is illegal for any person to own a gun who has been convicted of a crime punishable by imprisonment for a term exceeding one year, who has been adjudicated as a mental defective or who has been committed to a mental institution, or who has been discharged from the Armed Forces under dishonorable conditions.  18 U.S.C. § 922(g)(1), (4), and (6) respectively.  Under Article 128 of the Uniform Code of Military Justice (UCMJ), assault for battery of a child or aggravated assault for grievous bodily harm intentionally inflicted (both of which Kelley pled guilty to) are punishable by more than one year in prison.  *See also* Trial Transcript at p. 39, line 11, identifying maximum punishment of 5 years and 6 months. (attached).  Accordingly, under multiple portions of 18 U.S.C. § 922(g), it was illegal for Kelley to have a gun.

35.     The Air Force itself recognized that Kelley's conviction barred him from owning guns under the Lautenberg Amendment.  The General Court-Martial Order No. 10, of January 14,

2013 stated in bold at the top "Crime of Domestic Violence. 18 U.S.C. § 922(g)(9)".  This order

was affirmed by The General Court-Martial Order No. 53 of April 10, 2014.  Both orders were

distributed to a number of Air Force officers.  Both orders are attached hereto.

36.     Moreover, Department of Defense (DOD) Instruction 6400.06 states, "Although

the [Lautenberg] amendment only applies to misdemeanor crimes of domestic violence, it is DOD

policy that a 'qualifying conviction' also includes a conviction for a 'crime of domestic violence'

tried by general or special court-martial which otherwise meets the definition of a misdemeanor

crime of domestic violence".  *Id*. at section 6.1.4.3.  Further, "a conviction for an offense meeting

the definition of a 'felony crime of domestic violence' … shall also be considered a qualifying

conviction."  *Id*. at section 6.1.4.3.1.

37.     To prevent felons and domestic abusers from owning guns, the FBI's Criminal

Justice Information Services (CJIS) maintains a national computerized system for storing,

comparing, and exchanging fingerprint data and criminal history information.  The CJIS is the

largest division of the FBI and includes the National Crime Information Center (NCIC), Uniform

Crime Reporting (UCR), and Fingerprint Identification.[8]  Gun stores check the FBI CJIS National

Instant Criminal Background Check System (NICS) for whether a prospective buyer is eligible to

buy firearms.[9]

38.     The Department of Defense independently issued regulations requiring military

personnel to report crimes and military criminals to the FBI CJIS. Accordingly, the Department of

Defense and military service branches affirmatively undertook the duty to report military members

to the FBI CJIS for certain crimes.  For example, the Department of Defense regulations created a

---

[8] *See* https://www.fbi.gov/services/cjis

[9] *See* https://www.fbi.gov/services/cjis/nics

duty to report military members who were convicted of crimes that would be felonies, crimes such as assault against family members and children, and personnel who were dishonorably discharged. The military court system is separate from the civilian system and without reporting by the military, military criminals would be unknown to the FBI gun control database. DOD Instruction 5055.11 requires mandatory, non-discretionary reporting of these crimes. DOD Instruction 5055.11 repeatedly uses the word "shall" for the duties of its personnel to report (emphasis added):

> DODI 5055.11 ¶4:
>
> It **is DoD policy**, under Appendix 3 of title 5 United States Code and DoD Directive 5106.1 (references (b) and (c)), that the DCIOs and all other DoD criminal investigative and police organizations **shall submit to the FBI** as prescribed herein, offender criminal history data for all Armed Forces members they investigate for commission of an offense listed in enclosure 3.

DODI 5055.11 ¶ 5. RESPONSIBILITIES
> 5.1. The Inspector General of the Department of Defense **shall monitor** and evaluate compliance with this Instruction.
> 5.2. The Secretaries of the Military Departments and the Heads of the other DoD Components **shall**:
>> 5.2.1. Issue regulations, as may be necessary, to implement and comply with this Instruction.
>> 5.2.2. Ensure that Commanders establish and follow procedures to promptly notify the appropriate DCIO or other DoD criminal investigative or police organization:
>>> 5.2.2.1. When a military judicial proceeding is initiated or command action is taken in nonjudicial proceedings (as defined in enclosure 2) against a military subject investigated by a law enforcement organization for an offense listed in enclosure 3.
>>> 5.2.2.2. Of the final disposition of such military judicial or nonjudicial proceeding.

39.    The procedures for implementing the regulation are also mandatory:

> 6.1. Fingerprints and all additional information required by the FD-249, "Suspect Fingerprint Card," **shall be obtained** from military suspects under investigation by the DCIOs or any other DoD criminal investigative or police organization for offenses listed in enclosure 3.
>
>> 6.2.1. The FD-249 **shall be submitted** when a command initiates military judicial proceedings, or when command action is taken in

nonjudicial proceedings (as defined in enclosure 2) against a military subject investigated for the commission of an offense listed in enclosure 3.

6.2.2. Submission of the FD-249 **shall occur within 15 days** of command initiation of military judicial proceedings or when command action is taken in nonjudicial proceedings against a military subject (as defined in enclosure 2).

6.2.3. If final disposition of the proceeding is anticipated within 60 days of command initiation of military judicial proceedings or of command action in nonjudicial proceedings (as defined in enclosure 2), the FD-249 may be held and final disposition recorded on the FD-249. If the final disposition is not recorded on the FD-249, then an FBI/DoJ Form R-84, "Final Disposition Report," enclosure 5, is required.

6.2.4. If final disposition is not anticipated within 60 days, submission of the FD-249 **shall not be delayed** by the local investigative office pending completion of military judicial or nonjudicial proceedings.

6.3. Within 15 days after final disposition of judicial or nonjudicial proceedings, or the approval of a request for discharge, retirement, or resignation in lieu of court-martial, disposition information **shall be reported** by the DCIOs or other DoD criminal investigative or police organizations on the R-84, or an electronic data transfer equivalent, if it has not already been reported on an FD-249. Do not hold the FD-249 pending appellate actions; however, appellate action affecting the character of an initial disposition must be reported if it occurs. Dispositions that are exculpatory in nature (e.g., dismissal of charges, acquittal) shall also be filed.

40.     As shown in the non-discretionary regulations above, the Department of Defense undertook the duty of notifying the FBI, for inclusion in the FBI NCIS database, of certain military criminal offenses and adjudications that would keep a service member or ex-service member from buying a gun.  The Department of Defense (and military service branches) further undertook the duty of requiring specified members of the military in possession of the relevant information – including both military investigation and military law enforcement personnel – to submit offender criminal history data for all Military Service members investigated for qualifying offenses listed within the instruction. Article 128 assault charges are a qualifying offense.  *See id.* at Enclosure 3. The Department of Defense undertook the duty of having its Military Law Enforcement Officers (LEOs) collect fingerprints and all additional case information from military suspects under

investigation for qualifying offenses and annotate them on a finger print card within 15 days of a command initiated military judicial proceedings or a command action in non-judicial proceedings. The Department of Defense (and military service branches) undertook the duty of providing a Final Disposition Report (Form R-84) or an electronic equivalent to the FBI within 15 days after final disposition of judicial or non-judicial proceedings.  An update published on July 9, 2010, required offender criminal history data submission when probable cause existed of an offense.  An update published on April 15, 2012, required the submission of all fingerprints to the FBI electronically.

41.     In summary, the Department of Defense (and military service branches) undertook the duty of investigating, collecting relevant information on military convictions and military law enforcement actions, and forwarding that information to the FBI for inclusion in the FBI NCIS database where civilian gun sellers could access it when running FBI background checks, to determine which service members and ex-service members could legally buy firearms.  Absent the DODI instruction and Department of Defense undertaking, there would be no other way for the FBI – a civilian law enforcement body – to get information on criminal convictions from the military criminal justice system.

42.     Here, the Air Force was required by the Department of Defense to report Kelley to the FBI numerous times.  Airman Kelly's fingerprint cards should have been submitted to the FBI after probable cause was established.  Air Force personnel were required to – but failed to – submit the final disposition after court proceedings involving Airman Kelly, and there were dispositions here in both 2013 and 2014.  Moreover, a final fingerprinting was required to be conducted during Kelley's military prison confinement and sent to the FBI.  The Air Force was required to – but failed to – report when Kelly was dishonorably discharged for bad conduct.  Special investigators

were required to – but failed to – take one or more of these steps.  Security forces should have also submitted the final disposition and fingerprinting to the FBI.  Moreover, the Air Force should have had training and verification procedures in place for the personnel at Holloman Air Force base, to prevent these omissions.

43.  Multiple members of the Air Force had non-discretionary duties from both statutes and military regulations to report Kelley to the FBI so he could not buy a gun.  The Air Force personnel violated those duties.

44.  Moreover, 34 U.S.C. § 40901(e)(1)(C) requires federal agencies that have "any record of any person demonstrating" that the person should not be able to purchase a gun "shall, not less frequently than quarterly, provide the pertinent information contained in such record to" the Attorney General for the national instant criminal background check, and section (D) requires agencies to correct and update these records.  10 U.S.C. § 1562 requires the DOD to establish a central database of information on the incidents of domestic violence involving members of the armed forces and report incidents.  DOD policy is to comply with reporting requirements of the Federal Crime Reporting Act of 1988, the Victim's Rights and Restitution Act of 1990, the Brady Handgun Violence Prevention Act, the Lautenberg Amendment (banning domestic abusers from owning guns), and the Sex Offender Registration and Notification Program.

45.  DOD Directive 7730.47 and DOD Manual 7730.47-M implement federal criminal-incident reporting requirements with a non-delegable duty to monitor and ensure compliance.  A Defense Incident-Based Reporting System (DIBRS) is used to collect and transmit reportable criminal incidents to the FBI's Uniform Crime Report Program and for the FBI's background search system.

46.     DOD Manual 7730.47-M Volume 1, Enclosure 3 states the reporting data elements needed to comply with Federal criminal incident reporting pursuant to federal law.  Enclosure 3 states the Defense Incident-Based Reporting System:

> Shall be used to centralize the collection of information that is reportable by the DoD Components pursuant to The Brady Handgun Violence Prevention Act of 1993, which requires the Department of Defense to report these eight categories to the FBI for purposes of prohibiting firearm purchases:
> (1) Persons who have been convicted in any court of a crime punishable by imprisonment for a term exceeding 1 year.  ...
> (4) Persons who have been adjudicated as mental defectives or who have been committed to a mental institution. …
> (7) Persons convicted in any court of a misdemeanor crime of domestic violence.

47.     The immunity provision of the Brady Bill in 18 U.S.C. § 922 (t)(6)(A) exempted "an employee of Federal Government … responsible for providing information to the national instant criminal background check system".  It does not expressly apply to the DIBRS above.

48.     Unfortunately, DOD personnel did not comply with the DOD requirement to use the DIBRS.  The Inspector General for the DOD issued a Report Number DOGIG-2015-011, stating the DOD "is not reporting criminal incident data to the Federal Bureau of Investigation (FBI) … as required by Federal law."  As a result, "10 years of DoD criminal incident data have not been provided to the FBI…."  Specifically, between August 2012 and January 2013, the Air Force failed to report data to the DIBRS because the employee responsible had left the job and the replacement employee was not trained.  Similarly, the investigation of Airman Kelley indicates that the Air Force did not provide his information to DIBRS either.

49.     The DOD's December 6, 2018 Report also listed a number of mandatory regulations and policies that were not followed:

- DoDI 5505.11, discussed above, requires submittal of the subject's fingerprints to the FBI CJIS Division.

- AFI 31-205. "The Air Force Corrections System," April 7, 2004, Incorporating Change 1, July 6, 2007, Certified Current on April 28, 2011. USAF Corrections System policy required the confinement facility personnel to fingerprint Kelley during the in-processing into the confinement facility and to submit those records to the FBI after sentencing.

- AFOSI Manual 71-121 "Processing and Reporting Investigative Matter Certified Current on October 12, 2012," requires AFOSI Special Agents to submit a completed hard-copy final disposition report on military members to the FBI within 15 days of sentencing.

- AFOSI Handbook 71-105, "An Agent's Guide to Conducting and Documenting Investigations," March 9, 2009, states that AFOSI case agents should collect a subject's fingerprints on Subject Fingerprint Cards, or the electronic equivalent, once a subject interview is completed or terminated. It further states that Detachment leadership must review fingerprint cards and final disposition reports for accuracy, to verify the fingerprints were acceptable, and then document that review in the investigative case file.

- AFOSI Manual 71-118, volume 4, requires that all subjects of AFOSI investigations be fingerprinted using the fingerprint card or the appropriate I2MS application. It further states that fingerprints are usually obtained after a subject interview if the subject was investigated for committing a certain offense as prescribed in DoDI 5505.11, and it refers special agents to DoDI 5505.11 for the criteria on collecting and submitting fingerprints to the FBI CJIS Division

- AFOSI Manual 71-121 requires AFOSI Special Agents to complete two sets of fingerprint cards for every military subject suspected of committing an offense listed in attachment 8. It also states "[f]or military members, submit the electronic FD-249 through the Criminal Fingerprint activity to the FBI upon determination, following coordination with the servicing SJA [Staff Judge Advocate], and, as appropriate, civilian prosecutorial authority, that probable cause exists to believe the SUBJECT has committed an offense listed in attachment 8. The legal coordination will be documented in I2MS."

## D. The DOD and Air Force admit to negligence and blame systemic failures in reporting, training, and supervision

50.     The day after the shooting at the First Baptist Church of Sutherland Springs, November 6, 2017, the Air Force issued a press release taking responsibility and blaming Special Investigators for not reporting Airman Kelley to the FBI database. The Air Force stated, "Kelley's

domestic violence offense was not entered into the National Criminal Information Center database by the Holloman Air Force Base Office of Special Investigation."

51.     Moreover, the Air Force acknowledged systemic failures in its reporting.  On November 28, 2017, An Air Force spokesperson, Ann Stefanek, admitted that the failure to follow Pentagon guidelines to report Kelley's crimes to the FBI was "not an isolated incident and similar reporting lapses occurred at other locations."  Had Kelley's 2012 domestic violence conviction been entered in the FBI's database, as required by federal law and the Department of Defense regulations, that should have stopped the shooter from buying the rifle he used in the massacre. Stefanek further admitted, "Although policies and procedures requiring reporting were in place, training and compliance measures were lacking."

52.     Following the massacre, Government officials ordered a review of Air Force reporting compliance, and news outlets reported there are potentially around 60,000 incidents in the Air Force from 2002 that should have been reported to the FBI.

53.     The Office of Inspector General for the DOD issued a report on December 4, 2017, based on convictions in 2015 and 2016.  The report stated that the Air Force Office of Special Investigations (AFOSI) found 13 of 588 convictions that were not properly submitted, and noted that there were no procedures to verify compliance.  Worse, their police counterparts, the Air Force Security Forces Center (AFSFC), failed to submit 93 out of 155 (for both fingerprint cards and final disposition reports), a failure rate of 60% and the highest in the military.  There was no mechanism to ensure compliance.

54.     Further, for AFSFC the Inspector General's Report found that certain Air Force Instructions (AFIs) conflicted with DODI 5505.11.  AFI 31-118, "Security Forces Standards and Procedures," of March 5, 2014 (superseding AFI 31-201 from 2009) states the reports and analysis

section is responsible for fingerprint submission, in spite of that section only receiving case files with fingerprint cards at the end of the investigation and not when probable cause is found as required by DODI 5505.11.  Similarly, AFI 31-120 (superseding AFI 31-203 from 2009) states that prosecutors and court officials will submit final disposition reports to the FBI conflicting with DODI 5505.11 making Law Enforcement Officers (LEOs) responsible as well.  Moreover, the Inspector General's Report found that AFSFC Police Services Branch training focused on collection of fingerprints, but failed to address submitting fingerprint cards and final disposition reports to the FBI CJIS.

56.     The Inspector General also found that oversight was lacking at the AFSFC.  Their Management Internal Control Toolset (MICT) checklist items are supposed to be monitored and assessed as part of the installation commander's self-inspection program.  AFSFC is required to conduct self-inspections of its programs and field unites using the MICT.  The AFI 31-118 MICT checklist has a line item to validate whether fingerprinting procedures are followed in accordance with DODI 5505.11, but the checklist does not include submission compliance for either fingerprint cards or final disposition reports.  The AFSFC attributed the failures to "units being unfamiliar with fingerprint card and final disposition report submission requirements, units not using available training, and the lack of installed software for live scan devices the Air Force purchased."

56.     Tragically, the Air Force's training, verification/supervision, and compliance problems go back two decades.  In 1997, an internal review found the military was "not consistently submitting criminal history data to the FBI criminal history files."  The Air Force failed to submit fingerprint cards in 38% of cases, and did not submit final disposition reports in

50 percent of its cases.  A review in 2015 found 30% of Navy, Air Force and Marine Corps failing to submit fingerprint cards and final case outcome reports to the FBI.

57.     By December 6, 2018, the Inspector General of the DOD issued a 131-page Report titled, *Investigation into the United States Air Force's Failure to Submit Devin Kelley's Criminal History Information to the Federal Bureau of Investigation*.  The Air Force concurred with the findings.  See p. 117.  This report details multiple failures in reporting, training and supervision. There were at least four times that Airman Kelly's fingerprints should have been submitted to the FBI, and two times that a final disposition report should have been submitted.  *See* p. 107-108. Monthly supervisory reviews were "incomplete and ineffective".  *See* p. 110.  The DOD concluded that training on the submission of fingerprints and final disposition reports was ineffective and lacking, both for AFOSI Detachment 225 and the 49th Security Forces Squadron, and "there was no valid reason for the USAF's failures".  *See* p. 111-112; *see also* p. 96-98 (noting "training did not provide instructions on when or how to submit either the fingerprint card or the final disposition report to the FBI CJIS Division").  Indeed, the DOD "determined that this failure to submit Kelley's fingerprints was part of a systemic problem in AFOSI Detachment 225."  *See* p. 94. Worse, the case agent was actually deployed for seven months during the investigation and reported that he complained he could not do his job, stating, "Boss, I'm burnt out, I'm so burnt out." "Boss, I want to get out. I can't do this anymore."  However, no relief was provided.

58.     The DOD's December 6, 2018 Report also blamed supervision for not following mandatory policies.  "Although AFOSI policy required supervisory reviews to include both I2MS and the investigative case file (record copy), the AFOSI Detachment 225 SAIC and Superintendent focused their reviews on the I2MS activities and not on investigative case files" *See* p. 89.  "In

sum, we concluded that AFOSI Detachment 225 monthly supervisory reviews of Kelley's investigative case file were incomplete and ineffective". *See* p. 90.

### E. Farida Brown was shot multiple times in the legs during the Massacre of November 5, 2017

59.     On the morning of November 5, 2017, Farida Brown went to church and served breakfast. Sunday School began at 9:00 a.m., and the church service began at 10:45. They sang the first song, greeted one another, and sat down. The pastor wasn't there that day, and a girl stood up and told everyone they were going to surprise the pastor with a gift of a year of wild game meat. Farida was sitting to the right of the front door, in front of the music recording area. Farida heard something that sounded like fireworks. One of the church members said for everyone to get down. Farida hid under the pew. A man nearby stood up and was shot multiple times. A girl sitting to Farida's left was shot multiple times throughout her body and legs. The gunman, Airman Kelley, fired on the church congregation in multiple bursts. Kelly opened fire, shot his entire high capacity magazine, then went outside to reload, came back inside and emptied another high-capacity magazine, systematically hunting down anyone he had missed in the first round of shooting. He told the church that nobody was going to get out alive. Every time someone moved, he shot them.

60.     Farida was hiding under the pew with a girlfriend and thought they were going to die. She prayed with the girl and said they would all die and go to Heaven. Farida saw the girl die right next to her. Another girl very nearby was crying and screaming, which alerted Airman Kelley to their presence. Airman Kelley shot again, hitting the pew, sending shrapnel into Farida's legs. Farida was also shot directly in the legs with high-powered assault rifle rounds. From under the pew, Farida saw Kelley's boots approaching. She saw her legs shot with holes in them. Kelley saw Farida, still alive and wounded under the church power, and walked over to finish her off. By

the grace of God, Airman Kelley ran out of bullets the second time and went outside to reload again.  Farida passed out.

61.      When Airman Kelly went outside the second time to reload with further high-capacity magazines, a neighbor began shooting at Kelly, engaging him.  This neighbor's fire drew Kelly away.  When the authorities arrived, Farida tried to walk to them, but fell down on her shattered legs.  Farida later found herself in a Floresville, Texas hospital, with her family there.  Her son said she'd been in surgery for two hours.  A doctor said she was lucky to survive, but they could not remove all the shrapnel from her legs.  There are five pieces of shrapnel still in her left leg, which are too close to arteries to remove.  The doctor got other pieces out of her left leg and a bullet out of her right leg.  She will be in pain the rest of her life and never recover.

62.      Farida completed six months of physical therapy.  A wound nurse came three days a week to her home to help her heal.  Physical therapy came three days a week.  Two days after Christmas, most of the scarred holes in Farida's legs had closed.  However, there remained a large bullet hole in the top of her leg that did not close for many months.  Five pieces of shrapnel could not be removed from her left leg.  Ms. Brown will be in pain the rest of her life.

63.      The first funeral Farida attended was that of her best friends, a husband and wife named Theresa and Richard. Farida was in a wheelchair.  She was distraught and screaming, and eventually passed out.  Farida wished she could have died with them.

64.      At Thanksgiving, Farida could not eat. She went back to the church, but nobody was there except strangers. She couldn't stay. The survivors were mostly in the hospital. She went home and wept.  It was a long time before she could eat a meal.

65.      Prior to being shot by Airman Kelly, Ms. Brown was self-sufficient, active and energetic. She is severely limited in her life functions due to physical and mental trauma.  Farida

has a huge purple scar on her leg that looks like a worm.  She cannot drive or dance or garden.

She can't even put her grandkids or her great-grandbaby on her lap because it is very painful.  Her

legs hurt almost constantly and swell often, for weeks at a time.  She cannot climb stairs and had

to move out of her son's two-story home.  She cannot stand for too long because of the pain, but

she hurts when sitting for more than 30 minutes because her legs get stiff and painful.  A doctor

has told her that her injuries are permanent.  Farida Brown will need a caregiver and have medical

expenses related to the shooting for the rest of her life.  Further, her life-expectancy is reduced by

not being able to exercise like she used to do.  She has undergone an extensive course of trauma

therapy for her mental and emotional well-being.  She continues to have vivid and terrifying

nightmares.

66.     Farida has also suffered from being at the center of news attention.  Reporters have

hounded her, and false-flag conspiracy theorists have threatened her and her family.

## VI.     The FTCA Provides for Government Liability

67.     The Federal Tort Claims Act ("FTCA"), 28 U.S.C § 2671 *et seq.* waives sovereign

immunity for suits against the United States for the negligence of government actors.

The FTCA provides:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

> If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof.

> With respect to any claim under this chapter, the United States shall be entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States whose act or

omission gave rise to the claim, as well as any other defenses to which the United States is entitled.

28 USC § 2674.

68.     Further, the FTCA applies "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C.A. § 1346(b)(1).  Thus, courts routinely apply Texas state law to events that take place inside Texas where the conduct of US Government actors is at issue and the United States is a defendant.  *See, e.g., Carter v. Federal Bureau of Prisons*, 579 F.Supp.2d 798, 803 (W.D.Tex., El Paso 2008) ("courts have consistently held that … the 'law of the place' means 'the law of the state'").

69.     The wavier of sovereign immunity is tempered by the discretionary function exemption of 28 USC §2680, and primarily part (a), stating the wavier does not apply to:

> "any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

However, the discretion at issue comes at the policy stage, not at the implementation stage on the ground.  In *Blessing v. United States,* 447 F. Supp. 1160, 1172 (E.D. Penn. 1978), the court held if there is negligence in carrying out policies in a manner that deviates from the policy, and that causes harm, then there can be liability.  In this case, there is no Air Force policy of facilitating homicidal soldiers to conduct massacres.  Rather, once Airman Kelly began committing assaults on vulnerable individuals (his wife and her toddler), began threatening his commanding officers and telling others that he had homicidal intentions, the Air Force had a duty by law and by military regulation to protect the public and at the very least to carry out its own undertakings in a non-negligent fashion.

27

70.     Accordingly, the discretionary function exception does not apply to negligent government actions or decisions that do not involve or are not susceptible to policy analysis.  *See, e.g., Gibson v. U.S.*, 809 F.3d 807, 813 (5th Cir. 2016) (failure to maintain property).  In *Gibson*, the Fifth Circuit cited the Ninth Circuit's spectrum of policy decisions in holding that failure to maintain property like a private landowner was not the type of policy that affected whether the discretionary function exception applied, explaining the discretionary function exception's reach:

> On one end, negligent driving by a government official does not implicate the kinds of policy considerations protected by the exception. *Id*. [*O'Toole v U.S.*, 295 F.3d 1029] at 1035 (referencing a hypothetical first described in *Gaubert*, 499 U.S. at 325 n. 7, 111 S.Ct. 1267). On the other end of the spectrum are cases "where the government employee's exercise of judgment is directly related to effectuating agency policy goals.... such as the regulation and oversight of [savings and loan associations] by the Federal Home Loan Bank Board, *see Gaubert*, 499 U.S. at 332–34, 111 S.Ct. 1267; the release of vaccine lots by the Bureau of Biologics of the Food and Drug Administration, *see Berkovitz*, 486 U.S. at 545–48, 108 S.Ct. 1954; and the enforcement and implementation of airline safety standards by the [FAA], *see Varig*, 467 U.S. at 814–20, 104 S.Ct. 2755." Id. Turning to the facts of its own case, the *O'Toole* court held "that an agency's decision to forgo, for fiscal reasons, the routine maintenance of its property—maintenance that would be expected of any other landowner—is not the kind of policy decision that the discretionary function exception protects." *Id*. at 1036. In *815 so holding, the court cautioned that "[t]he danger of the discretionary function exception ... swallow[ing] the FTCA is especially great where the governments takes on the role of a private landowner." *Id*. at 1037.

Here, failing to deal with the mental health of a criminal and dangerous soldier or failing to report him to DIBRS or the FBI did not involve any act of discretion or policy analysis.  The reporting was required. The individuals who had a duty to report had no discretion whether to choose to make the reports.  They simply had to make the reports. They did not and as a direct result, Ms. Brown was shot multiple times and dozens of others with here were similarly injured or killed.

71.     The Fifth Circuit has found liability against the government in a FTCA case for releasing an emotionally unstable soldier who had assaulted his wife without restrictions, after which he obtained a gun and murdered his ex-wife. *Underwood v. US*, 356 F.2d 92 (5th Cir. 1966)

(finding murder was foreseeable). The court reviewed the regulations that were broken in the process of the soldier getting the gun. The Fifth Circuit found that the discretionary function test was not violated because the conduct in question was not the setting of policy, it was in not following policy that had already been put in place, just like here.

72. In addition, the discretionary function exemption does not apply to government failures to follow specific orders. For example, in *Garza v. U.S.*, 161 Fed.Appx. 341, 344, 2005 WL 3478009, at *2 (5th Cir. 2005), the court held that the discretionary function test did not apply to a policy-making decision that had already been made and set forth in an order. In *Garza*, the district court held, "It is foreseeable that a violent fight among inmates is likely to occur when the recreation yard is left unsupervised." 2007 WL 776682, at *8 (S.D. Tex. 2007). Accordingly, breach of a duty to patrol and supervise the rec yard was the proximate cause of Plaintiff's personal injuries and damages. *Id.*; 161 Fed. Appx. at 344. This reasoning was also followed in *D'Antuono v. U.S.*, 2010 WL 2465493, at *5 (N.D. Tex. 2010) ("the post order requiring immediate contact of an M–1 nurse upon a change in a prisoner's behavior was mandatory and was not followed"), awarding funeral and burial expenses for a suicide.

73. The claims to be brought in this case sound in Texas law under the torts of negligence, negligent undertaking, and negligent training and supervision, as discussed below.

74. Negligent undertaking causes of action are made pursuant to Restatement Second of Torts §323 (1965), adopted into Texas law and described in *Torrington v. Stutzman*, 46 S.W.3d 829 (Tex. 2000). The gravamen of a negligent undertaking claim under Texas law is this: one who gratuitously, or for pay, takes on a duty he would not otherwise have, is liable for his negligence in performing the undertaking.

75. In this case, the United States government, by and through congressional acts in

passing laws and the President in signing those laws, undertook the duty of having the Armed Forces, including the Air Force, report criminal service-members to the FBI so that they could not buy guns. Congress and the President further undertook the duty of having the Armed Forces, including the Air Force report service-members convicted of misdemeanor domestic violence to the FBI so that violent domestic abusers could not buy guns. The Department of Defense, by and through its regulations, undertook the duty of collecting and forwarding the fingerprints of service members who were not allowed to buy guns to the FBI so that criminal ex-servicemen could not buy guns. The United States government – through the Department of Defense – undertook these duties and assigned the duties to the branches of the Armed Forces to carry them out. Air Force Special Investigators undertook the duty of investigating Kelley for the crimes reported to them, as well as the corollary duties of fingerprinting Kelley and reporting fingerprints and final disposition to the FBI, as required by DODI 5505.11 and federal law. Air Force Security Forces also took on the duty of policing Kelley as well as fingerprinting Kelley and reporting fingerprints and final disposition to the FBI, as required by DODI 5505.11 and federal law.

76.    Both Air Force Special Investigators and Security Forces acted negligently in failing to submit required information about Kelley to the FBI, which failed to meet the standard of care. Moreover, the Air Force and Office of Inspector General for the DOD identified failures in training and failures in supervision as reasons for the failure of Security Forces to provide fingerprints and final disposition reports to the FBI. Accordingly, causes of action exist for negligence, negligent undertaking, and negligent training and supervision.

77.    Negligent Undertaking claims have been upheld by the US Supreme Court for FTCA claims. *Sheridan v. US*, 487 U.S. 392, 108 S.Ct. 249 (1988) held that a negligent undertaking claim was viable against the United States, that involved the US Navy negligently

protecting the plaintiffs from a Navy sailor's assault when it had undertaken an effort to do so.  In *Indian Towing v. US*, 350 US 61 (1955), the Supreme Court applied the FTCA to a negligent undertaking by the government to a government function (running a lighthouse), when the conduct at issue would have subjected a private party to liability in a similar situation – though not the exact situation of running a lighthouse, which is a common government function.

78.     In Texas, a private party can be liable for failure to report or alert authorities to a dangerous situation that they either created, or are in a special position to know the danger.  *See Golden Spread Council, Inc. # 562 of the BSA v. Akins*, 926 S.W.2d 287, 290-92 (Tex. 1996) (Boy Scout Area Council liable for breaching a duty when recommending a scout master who had previously molested boy scouts); *Town Hall Estates-Whitney, Inc. v. Winters*, 220 S.W.3d 71, 76 (Tex. App.—Waco 2007) (liability for failure to report abuse and neglect in nursing homes to Texas Dept of Human Services or a law enforcement agency); *Tex. Home Mgmt. v. Peavy*, 89 S.W.3d 30, 34 (Tex. 2002) (liability for releasing juvenile from mental health facility who then murdered a girl, finding a duty to control the conduct of others when there exists a special relationship).

79.     Likewise, if an actor creates a dangerous situation, it may be liable to third parties. *See El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987) (Dram shop case discussing the duty owed to the public when serving alcohol to a drunk bar patron who drives); *Gooden v. Tips,* 651 S.W.2d 364 (Tex. App.—Tyler 1983, no writ) (doctor who prescribed Quaalude to a patient with a history of drug abuse but failed to warn her not to drive).

80.     Regarding duties to third parties, the Texas Supreme Court, in *Otis Engineering Corp v. Clark,* held that

> when, because of an employee's incapacity, an employer exercises control over
> the employee, the employer has a duty to take such action as a reasonably

prudent employer under the same or similar circumstances would take to prevent
the employee from causing an unreasonable risk of harm to others.

668 S.W.2d 307, 311 (1983).

81.     The Air Force had an employee, an airman, who was mentally impaired.  He was
extremely criminally violent and was trained by the Air Force to use military assault rifles to kill.
Kelley was confined to a psychiatric hospital, and the Air Force documented that he would harm
people if released.  The Air Force had a duty not to release Kelley in these circumstances without
taking precautions – such as the precaution that the US Congress and DOD had given to it, to alert
civilian authorities about their dangerous, psychotic soldier that they were turning loose on the
unsuspecting public  After the Air Force released Kelley from confinement, it had a duty to report
him to the FBI for inclusion in the NICS database so he couldn't buy an assault rifle and use his
military training, combined with his known violent tendencies, to do exactly what he had been
trained by the Air Force to do, to injure and kill using an AR-.556 style rifle.

82.     The Texas Courts look primarily at foreseeability of harm to determine if a private
individual owes a duty, and also at whether one party has superior knowledge of the risk or the
right to control the actor whose conduct caused the harm. *See Texas Home Mgmt., Inc. v. Peavy*,
89 S.W.3d 30, 36 (Tex. 2002) (intermediate care facility had duty to a woman shot and killed, for
releasing a minor who had engaged in violent and extreme behavior at the care home); *see also
Golden Spread Council, Inc. # 562 of the BSA v. Akins,* 926 S.W.2d at 291, citing *Graff*, 858
S.W.2d at 920.

83.     Here it is entirely foreseeable that a trained soldier (trained to use the exact kind of
gun he used in the massacre) who was mentally disturbed, criminally violent, and had tried to buy
a gun when he broke out of a military mental health institution, would try to buy another gun and
commit another act of violence.  The Air Force itself documented that Kelley was a risk to harm

others if released.

84.     Moreover, the specific risk was foreseen by the defendant United States
Department of Defense, who created the regulations and instructions to protect against the very
harm that befell Farida Brown and her fellow congregants at First Baptist Church of Sutherland
Springs. Further, the Air Force had superior knowledge of Kelly's violent tendencies, because it
committed Kelley, prosecuted Kelly and convicted him.  His conviction was unknown to civilian
authorities, including the FBI and local law enforcement, because the military court system is
separate from the civilian court system. The only way the FBI would know about Kelly was if the
Air Force reported it.  The Air Force had the ability to control Kelly, and had actual control of
him, before it dishonorably discharged him without warning anyone.  Texas Courts would certainly
find a duty here.

85.     Texas would find liability owed by a private person in a similar situation, for all the
reasons, legal and factual, stated above.

## VII.    CAUSES OF ACTION: Negligence, Negligent Undertakings, Negligent Training and Supervision

86.     Plaintiff incorporates by reference each of the preceding paragraphs as if stated
fully herein.

87.     Farida Brown brings suit pursuant to the FTCA against the United States for
negligence, negligent undertaking, and negligent training and supervision.  The Air Force itself
has identified acts and omissions stating causes of action under each of these torts.  Particularly,
the Air Force's press release of November 6, 2017, stated, "Kelley's domestic violence offense
was not entered into the National Criminal Information Center database by the Holloman Air Force
Base Office of Special Investigation."  On November 28, 2017, an Air Force spokesperson Ann
Stefanek admitted, "Although policies and procedures requiring reporting were in place, training

and compliance measures were lacking." Moreover, the Air Force and Office of Inspector General for the DOD described the background of Kelley's mental breakdown in the Air Force and identified failures in training and failures in supervision as reasons for the failure to provide fingerprints and final disposition reports to the FBI.

## A.  Negligence in the Danger the Air Force Created

88.    Plaintiff incorporates by reference each of the preceding paragraphs as if stated fully herein.

89.    A negligence cause of action has three elements:

(1) a legal duty owed by one person to another,
(2) a breach of that duty, and
(3) damages proximately caused by the breach.

*See, e.g., D. Houston, Inc. v. Love,* 92 S.W.3d 450, 454 (Tex. 2002).  Proximate cause requires cause in fact and foreseeability; harm is foreseeable if a person of ordinary intelligence should have anticipated the danger her negligence created for others. *Id*.  Texas recognizes negligence relating to failures of background checks with guns.  *Estate of Arrington v Fields*, 578 S.W.2d 173 (Tex. App.-Tyler 1979) (negligent hiring for failing to do a background check for an armed security guard).

90.    In Texas, a private party can be liable for failure to report or alert authorities to a dangerous situation that they either created, or are in a special position to know the danger.  *See Golden Spread Council, Inc. # 562 of the BSA v. Akins*, 926 S.W.2d 287, 290-92 (Tex. 1996) (Boy Scout Area Council liable for breaching a duty when recommending a scout master who had previously molested boy scouts); *Town Hall Estates-Whitney, Inc. v. Winters*, 220 S.W.3d 71, 76 (Tex. App.—Waco 2007) (liability for failure to report abuse and neglect in nursing homes to Texas Dept of Human Services or a law enforcement agency); *Tex. Home Mgmt. v. Peavy*, 89 S.W.3d 30, 34 (Tex. 2002) (liability for releasing juvenile from mental health facility who then

murdered a girl, finding a duty to control the conduct of others when there exists a special relationship).

91.     Likewise, if an actor creates a dangerous situation, it may be liable to third parties. *See El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987) (Dram shop case discussing the duty owed to the public when serving alcohol to a drunk bar patron who drives); *Gooden v. Tips,* 651 S.W.2d 364 (Tex. App.—Tyler 1983, no writ) (doctor who prescribed Quaalude to a patient with a history of drug abuse but failed to warn her not to drive); *see also* Dram Shop cases *Greater Houston Transp. Co. v. Philipps*, 801 S.W.2d 523, 526 (Tex. 1990); *see also Scurlock v. Pennell*, 177 S.W.3d 222, 225 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (the particular injury does not need to be foreseen, only the general character).

92.     Here, the Air Force trained a mentally unstable person in how to injure and kill with the exact type of weapon he later used to kill and injure a large group of church-going civilians. Kelley received training on hand guns and assault rifles, including the exact kind of weapon used in the church massacre, a 5.56 AR.  When Kelley initially checked into a mental health facility in the Air Force, Kelley blamed yelling and criticism by his superiors for his mental health problems. It is well documented that the Air Force believed Kelley to be a homicidal threat to kill others, that he made threats of mass murder, that he planned to kill his superior officers, that he tried to buy guns while confined to a psychiatric hospital, that he fractured a baby's skull, and that he beat and threatened to shoot his wife – all while in the Air Force.

93.     Moreover, it is documented that Kelley was mentally impaired, homicidal, and suicidal.  When Kelley was caught attempting to buy guns on the internet to be sent to the psychiatric hospital, a nurse reported that "his insight and judgment are so impaired that he does not make the connection about how that does not look good on him."  Xavier Alvarez from Peak

Behavioral was quoted as saying, "This kid – he was hollow," and "I could never reach him." Moreover, Kelley's Commander prepared a confinement package stating that he was "convinced" that Kelley was "dangerous and likely to harm someone if released". Yet that is exactly what the Air Force later did.

94.     Despite the Air Force knowing full well that Kelley had developed into a homicidal maniac, there was no attempt to protect the public from the danger the Air Force created. Kelley was released after a year in confinement, and he continued to commit crimes and sexual assaults before his final bad-conduct discharge from the Air Force. The Air Force did not determine that Kelley's mental state had improved. The Air Force had a duty not to release Kelly onto an unsuspecting public in these circumstances.

95.     Moreover, it was against DOD and Air Force mandatory regulations to release Kelley without completing his final disposition. After the Air Force released Kelley, it had a duty to warn the public. DOD and Air Force mandatory policies and regulations required reporting him to the FBI for inclusion in the NICS database so he couldn't buy an assault rifle to use his training, combined with his known violent tendencies, to injure and kill.

96.     Even after Kelley was discharged, in 2016, he again sent a murderous threat to one of his former Air Force superiors, who reported it internally. Yet still the Air Force failed to warn or to act to protect the civilian public in any manner, including the statutory manner of reporting to the FBI for use in the NICS database (or to the DOD's DIBRS database) so he couldn't buy a gun and carry out his threats and homicidal ideation.

97.     During the Sutherland Springs church massacre, when Plaintiff was severely injured by being shot multiple times in the legs, Kelley did exactly what he had been trained to do by the Air Force: he used an AR 5.56 to shoot, kill, and maim people in mass. However, instead

of an enemy at war time, he wiped out a church congregation at Sunday morning worship.

98.    Mass shootings by mentally deranged people with access to firearms are foreseeable.  Preventing such shootings was the purpose of the Brady Bill.  There have been other massacres.  On June 17, 2015, Dylan Roof shot and killed nine people at Emanuel African Methodist Episcopal Church in Charleston, South Carolina.  Roof should not have been able to clear a background check for purchasing a gun.  On April 16, 2007, Seung-Hui Cho shot and killed 32 people on the Virginia Tech campus.  In 2005, a court determined Cho was mentally ill and had him committed, but state authorities did not report him to the FBI.

99.    The United States Congress foresaw the danger as well, and mandated by law that it is illegal for someone like Kelley to own a gun, for his conviction of domestic violence (18 U.S.C. § 922(g)(9)), his conviction of a crime punishable by imprisonment for a term exceeding one year (§ 922(g)(1)), his being committed to a mental institution (§ 922(g)(4)), and having been discharged from the Armed Forces under dishonorable conditions (§ 922(g)(6)).  The DOD mirrored those duties in its regulations.

100.    Worse, the Air Force knew it had a systemic compliance problem with mandatory reporting, and still failed to address the problem – long before Airman Kelly was dishonorably discharged, and again afterwards when it knew that its reporting was deficient but failed to correct it prior to the church massacre.  In this very situation, the case manager reported to his boss that he could not keep up with his case load, and especially not while he was serving overseas, but the Air Force failed to correct the situation.

101.    Nevertheless, the Air Force released Kelley without addressing his mental health problems, without warning the public, and without completing his final disposition by reporting him to DIBRS or the FBI in violation of numerous laws, DOD directives, and Air Force

instructions.

102.    The Air Force had undertaken to protect the civilian public by dealing with the danger it created.  The Air Force knew that it had trained Kelley to kill and maim with guns and that he had developed mental disorders, was homicidal, had physically abused his wife, abused and fractured the skull of an infant boy, and had threatened mass murder.  The Air Force confined Kelley in a psychiatric hospital, and worked with El Paso police to return Kelley to the psychiatric hospital after Kelley escaped and tried to obtain guns.  The Air Force documented that Kelley would harm others if released.  Despite undertaking the duty of confining and treating Kelley, the Air Force later abandoned its efforts and then the Air Force released Kelley without making any determination that it was safe to do so and without any warning to the public at large.  In fact, Kelley continued to commit assaults after being released and before being discharged by the Air Force.  The Air Force is liable for undertaking to deal with the danger it created, and failing to reasonably do so.  *See Torrington v. Stutzman*, 46 S.W.3d 829 (Tex. 2000) (negligent undertaking).

103.    The Air Force is liable for negligence in the danger it created with Airman Kelley.

**B.  Negligent Undertaking in Failing to Report Kelley both to the FBI and to DIBRS**

104.    Plaintiff incorporates by reference each of the preceding paragraphs as if stated fully herein.

105.    Negligent undertaking claims are provided for in Texas pursuant to Restatement Second of Torts §323 (1965) as described in *Torrington v. Stutzman*, 46 S.W.3d 829 (Tex. 2000):

> While Texas law imposes no general duty to "become [a] good Samaritan," we have recognized that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation. *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 396 (Tex.1991); *Colonial Sav. Ass'n v. Taylor,* 544 S.W.2d 116, 120 (Tex.1976); RESTATEMENT (SECOND) 838*838OF TORTS §§ 323, 324A (1965).
>
> In *Colonial Savings,* 544 S.W.2d at 119-20, we relied upon section 323 of the *Restatement,* which provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 323 (1965).

106.    In this case, the Department of Defense undertook the duty of having the Armed Forces, including the Air Force, report criminal service-members to the FBI for inclusion in NICS background checks that prevent felons, domestic abusers, and unfit service members (those dishonorably discharged) from buying guns.  The Department of Defense and Air Force undertook this duty.  They issued regulations and instructions (listed above), and the DOD applied regulations to the Inspector General of the Department of Defense, the Secretaries of the Military Departments and the Heads of other DOD Components, and military Commanders.  They provided specific procedures that the military personnel would undertake to notify the FBI of criminal convictions for crimes that would be felonies in the civilian justice system, domestic and child abuse, and other specified crimes, so that the FBI (who would otherwise not have such information from the military) could put the service members and ex-service members in the FBI NCIS database to prevent the service members and ex-servicemembers from buying guns.

107.    The FBI – and by extension the civilian public – relied on the military branches, by and through the Inspector General of the Department of Defense, the Secretaries of the Military Departments, and Commanders, to follow the DOD's mandatory regulations and instructions and actually provide the information to the FBI.  Gun dealers check the NCIS database when selling guns to determine who they can sell guns to.  The NCIS database is useless if the information in it is incorrect.  Undertaking to provide information to the FBI for criminal soldiers, but then not

doing so, created a dangerous situation whereby a convicted and known homicidal soldier with psychiatric problems could have a clean record and the legal ability to buy a gun. This increased the risk to the public because when the Department of Defense and Air Force undertook the duty to provide service member criminal conviction information to the FBI, the civilian authorities did not seek out that information for inclusion separately.

108.    In this case, the Department of Defense and Air Force undertook the duty of having Air Force Special Investigators investigate Kelley, which included the mandatory ministerial acts of reporting Kelley to the FBI (both when probable cause was established and at final disposition) and forwarding his fingerprints to the FBI. The Department of Defense and Air Force undertook the duty of having the Air Force Security Forces police Kelley, which included the mandatory ministerial acts of fingerprinting Airman Kelley and reporting fingerprints and final disposition to the FBI.  For both Special Investigators and Security Forces, completing these ministerial acts, dictated in DODI 5505.11, was the standard of care.  Accordingly, the Air Force, by and through its personnel, breached its undertaken duty and was negligent by completely failing to perform the ministerial duty of reporting Kelley as required by DODI 5505.11 and federal law.  Both Air Force Special Investigators and Security Forces acted negligently in failing to submit information about Kelley to the FBI.

109.    The Department of Defense and Air Force also undertook the duty of reporting Airman Kelley to a Department of Defense database DIBRS, also to be used for reporting to the FBI.  See DOD Directive 7730.47 and DOD Manual 7730.47-M, discussed above.  The Air Force, by and through its personnel, breached this undertaken duty and were negligent by failing to perform ministerial tasks.

## C. Negligent Training and Negligent Supervision

110.    Texas recognizes causes of action for negligent training and negligent supervision. *See, e.g., Black v. Smith Protective Servs*. 1026 Tex. App. LEXIS 10475; 2016 WL 5400565 (Tex. App.—Houston [1st Dist.] 2016) (no pet.) (summary judgment reversed when company knew about prior false reports to police by security guard and did not take adequate action).  Liability exists for negligent training and supervision when:

(1) the employer did not use ordinary care in training or supervising an employee; and

(2) the employer's failure to use ordinary care proximately caused injury to Plaintiff.

*See Morris v. JTM Materials, Inc*., 78 S.W.3d 28, 49 (Tex. App.—Fort Worth, [2nd Dist.] 2002) (acknowledging a duty to the general public for creating an unreasonable risk of harm to others).

111.    In this case, the Air Force undertook the duty of training personnel to report convictions for crimes punishable by one year or more in military prison, domestic violence convictions, mental health commitments, and dishonorable discharges.  The Air Force completely failed to do so for Airman Kelly.  The Air Force's failure to report Airman Kelly to either the DOD's DIBRS database or to the FBI for inclusion in the NCIS database was not isolated.  After the Sutherland Springs massacre, the Inspector General found that the Air Force had failed to report 60% of airmen with qualifying convictions to the FBI.  This was thousands of soldiers, all trained by the Air Force to injure and kill, all of whom had committed serious and violent crimes, who were not put in the NCIS database, so all of these trained madmen had access to legally purchased high-powered weapons.

112.    This failure to train the personnel who were charged with reporting criminal servicemen to the NCIS databases was both systemic through the Air Force and through the Special Investigations and Security Forces at the Holloman Air Force Base.  The DOD's Inspector

General's Reports of Dec. 2017 and Dec. 2018 each make clear that both the Special Investigations and Security Forces were prone to failure and not properly trained.

113.    The Air Force undertook the task of properly training its reporting personnel, but it failed to do so reasonably.

114.    Moreover, the Air Force undertook but failed to properly supervise the reporting personnel, or to have a system that verified if reporting had occurred, which it clearly had not.

115.    These failures by the Air Force to train and to supervise its reporting personnel led to specific individuals at Holloman Air Force Base failing to submit reports to both DIBRS and to the FBI about Airman Kelly.  Accordingly, the Air Force is liable for negligent training and negligent supervision of reporting personnel, who clearly failed at their jobs.

**D.  Brady Bill Immunity Does Not Apply**

116.    In 1993, the Brady Bill established an instant criminal background check for gun sellers to determine whether a sale was illegal under 18 U.S.C. § 922.  One of the bill's sponsors stated the purpose was to prevent convicted felons with history of mental illness from buying guns to commit massacres.[10]  In 1996, the Lautenberg Amendment made it illegal to sell guns to anyone convicted of a domestic violence crime, recognizing that in abusive relationships, the presence of a gun increases the risk of homicide.[11]

117.    In the sister case *Holcombe*, the United States has filed a motion to dismiss contending that a narrowly worded immunity provision in the Brady Bill, specifically for individual employees, should bar any suit related to gun violence where reporting was not correct. *See* 18 U.S.C. § 922 (t)(6)(A).  Given the Air Force's decades-long history of not complying with

---

[10]  Congressional Record, House, at H731 (Feb. 22, 1993), statements regarding Larry Dale opening fire in a grocery store in Oklahoma.
[11]  142 Cong. Rec. 22986 (1996) (statement of Sen. Wellstone); *see also Voisine v. United States* 136 S.Ct. 2272 (2016).

criminal reporting requirements, applying (t)(6) beyond its wording would defeat the purpose of the Brady Bill and the FTCA.

118.    The injustice of such a position cannot be understated.  The Air Force has already confessed to multiple acts of negligence that led to the church massacre and Ms. Brown's serious, debilitating and permanent injuries.  There are multiple laws, regulations, and instructions that required the Air Force, specifically, to report Airman Kelley to the FBI and to a DOD database so that he could not buy a gun and shoot people like Ms. Brown.  The government would defeat decades of federal law and the DOD's own policies by creating a right with no remedy.  This should not be the result.

119.    18 U.S.C. § 922 (t)(6) was put in the Brady Bill when it was first filed in Congress and was not amended.  It names four classes – and only four classes – for which there is immunity: local governments, *individual employees* of the Federal Government, individual employees of State Government, and individual employees of local government.  State Governments are immune from suit under federal law in federal courts by the 11th Amendment to the Constitution, so State Governments need not be mentioned in the immunity exception.  But, one class of defendant is not mentioned, and that is the federal government itself.

120.    The immunity provision is also limited to only certain employees.  18 U.S.C. § 922 (t)(6)(A) exempted "an employee of Federal Government" "responsible for providing information to the national instant criminal background check system" "for failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful under this section".  Accordingly, there is no immunity for those with other duties.  Here, Air Force personnel were responsible for reporting to the FBI, and not the NICS itself.  Moreover, (t)(6) says nothing about exempting government from created dangers, or exempting persons with responsibility to

investigate, report to another database like DIBRS, train, or supervise, nor does it revoke the multiple other laws and DOD regulations requiring reporting or the FTCA itself making state-law claims actionable against the Federal government.

121.   Congress (and President Clinton who signed the Brady Bill) was surely aware of the Federal Tort Claims Act, and of the waiver of sovereign immunity for acts of the federal government which would be cognizable if committed by private individuals under State Law in like circumstances, as shown above.  Had Congress wanted to exempt the federal government, it very easily could have inserted the phrase "federal government" into the exception in 18 U.S.C. § 922 (t)(6).  It did not do so.  Presuming that the legislature meant what it said is a basic rule of statutory interpretation.  *See, e.g., Conn. Nat'l Bank v. Germ*ain, 503 U.S. 240, 253-4 (1992).  Moreover, then-Representative Chuck Schumer verified that (t)(6) was not meant to change governmental immunity, stating "I believe this provision is consistent with longstanding departmental provisions on governmental immunity." [12]  There are no statements to the contrary.

122.   Ms. Brown is not suing an individual member of the federal government for failure to report.  Rather, Farida Brown is suing the US Government itself, by and through the Department of Defense and the Air Force, for being liable for the danger it created, for negligent undertaking in the failure to report, and also for failure to investigate, train, and supervise.  This was not the failure of one individual.  It was a systemic failure of the Air Force to perform its legal and regulatory duties, which allowed an extremely violent, mentally deranged, trained soldier, to purchase the same kind of military assault rifle that the Air Force trained him to use, to kill and maim innocent churchgoers at Sunday worship.

---

[12] Hearing on H.R. 1025 Before the H. Subcomm. on Crime & Crim. Justice 1034d Cong. 85 (Sept. 30, 1993).

## VIII.   DAMAGES

123.   Plaintiff alleges that all damages suffered by Farida Brown were proximately caused by the actions, failures and omissions of Defendant the United States of America.   She seeks damages for:

      a.   For general and special damages, including:

          1)   Mental anguish, past and future;

          2)   Pain and suffering for personal injuries, past and future;

          3)   Medical expenses, past and future;

          4)   Physical impairment, past and future;

          5)   Disfigurement, past and future;

          6)   Cost of care and loss of household services, past and future;

          7)   Loss of enjoyment of life, past and future;

          8)   Loss of life expectancy;

      b.   For post-judgment interest as allowed by law;

      c.   For cost of suit incurred herein; and

      d.   For such other and further relief as this Court may deem just and proper.

## IX.   CONCLUSION

124.   Nothing that Plaintiff did or failed to do contributed in any way to the injuries and damages described above.

125.   Plaintiff is entitled to recover the maximum lawful post-judgment interest on their damages as permitted and provided by the FTCA, and Texas common and statutory law.

126.   Plaintiff respectfully reserves the right to amend and/or supplement this complaint as discovery of facts require.

127.   WHEREFORE, Plaintiff prays for judgment against Defendant United States of America, by and through its Department of the Air Force.

**DATED:  February 25, 2019**

RESPECTFULLY SUBMITTED,
SCHREIBER | KNOCKAERT, PLLC

*/s/ Joseph M. Schreiber*
**Joseph M. Schreiber (Lead Counsel)**
Texas Bar No. 24037449
701 N. Post Oak Rd., Suite 325
Houston, TX  77024
Phone (281) 949-8904
Fax (281) 949-8914
joe@lawdoneright.net


*/s/ Erik A. Knockaert*
**Erik A. Knockaert (co-counsel)**
Texas Bar No. 24036921
701 N. Post Oak Rd, Suite 325
Houston, TX  77024
Phone (281) 949-8904
Fax (281) 306-0340
erik@lawdoneright.net


**Attorneys for Plaintiff Farida Brown**